IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 1, 2008 Session

**STATE OF TENNESSEE v. JOHN FRED HOWARD**

**Direct Appeal from the Criminal Court for Shelby County
No. 03-05005     John P. Colton, Jr., Judge**

**No. W2008-00208-CCA-R3-CD  - Filed April 17, 2009**

The defendant, John Fred Howard, was convicted of first degree premeditated murder by a Shelby County jury and subsequently sentenced to a term of life imprisonment. On appeal, he has raised eight issues for our review: (1) whether the evidence at trial was sufficient to support the verdict, specifically the jury's rejection of his claim of self-defense and the element of premeditation; (2) whether the trial court erred in refusing to sequester the jury; (3) whether the trial court erred in failing to suppress graphic photographs of the deceased; (4) whether the trial court erred in admitting test results from two blood samples which the defendant did not get until the second day of trial; (5) whether the trial court erred in admitting certain evidence without the establishment of a valid chain of custody; (6) whether the trial court erred in allowing witness testimony which was highly prejudicial to the defendant; (7) whether the trial court erred by refusing to allow defense counsel to publish certain exhibits to the jury immediately after they were admitted, which minimized their impeachment value and violated the defendant's right of cross-examination; and (8) whether the cumulative error at trial demands a reversal in the case. Following review of the record, we find no reversible error and affirm the judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and J.C. MCLIN, JJ., joined.

Timothy J. Williams, Memphis, Tennessee, for the appellant, John Fred Howard.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; William L. Gibbons, District Attorney General; and Glen Baity and Rachel Newton, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

# Factual Background

At approximately 7:00 p.m. on April 4, 2003, the sixty-two-year-old defendant fatally stabbed the victim, Tim Howard, his fifty-three-year-old brother, during the course of an altercation between the two men at their home. The defendant was later indicted by a Shelby County grand jury on one count of first degree murder. Multiple witnesses testified at trial.

The State first called the victim's wife, Mrs. Marcia Howard, whom he had been married to since 1994. She testified that the two separated in November 2002, and the victim moved in with the defendant at that time. She also testified that the victim had joined Alcoholics Anonymous in December. Mrs. Howard testified that the victim and the defendant had a third brother, Charles Howard, who was mentally disabled, who had died ten months prior to the death of the victim. Their mother had left a trust fund for Charles Howard upon her death, which was managed by the defendant, a certified public accountant. According to Mrs. Howard, she and the victim were concerned about the management of that account, believing that the defendant had taken the money, which was supposed to be divided equally between the two following Charles Howard's death. The defendant failed to satisfactorily answer the victim's questions regarding the money. She testified that the two also inherited their mother's house, which was paid for. The victim wanted the defendant to obtain a mortgage on the house in order to repay him the $110,000 to $120,000 he was owed from the trust.

Mrs. Howard also testified that her home was broken into after her separation from the victim and that she suspected the victim was responsible because neighbors said they saw his car in the area at the time. Upon recommendation by the police, she obtained an order of protection against the victim. After the order of protection was issued, the victim left a note in her mailbox which read, "Be afraid. Be very afraid. The anticipation of death is worse than death itself." She renewed the order of protection, stating she wanted it in place until the marital dissolution agreement was finalized. According to her testimony, she did not renew the order for her protection. She testified that the victim was never physically abusive toward her.

During the week prior to the victim's death, the defendant called Mrs. Howard and told her that he wanted the victim out of the house. On the day of the murder, the defendant called her several times and stated that he wanted to get the victim committed based upon his alcohol problem. According to Mrs. Howard, the victim had not had a drink in several months. The defendant was becoming "very agitated at the situation" and kept insisting that he wanted the victim out of the house. Mrs. Howard informed the defendant that the victim had found a condominium, which he planned to purchase in the following weeks, after the defendant gave him the money he owed. The defendant commented that the victim had no business paying cash for the condominium. According to Mrs. Howard, the defendant then stated he was not going to give the victim the money for his share of the trust fund. She did not speak with the defendant again until he called her following the murder and informed her that he had stabbed the victim with a knife after the victim had "jumped him."

The next day, she returned to the home in order to get funeral clothes for the victim. While in the house, she found a note which had been torn up and placed in the top of the defendant's closet. The note referenced the defendant's agreement to mortgage the home and pay the victim all money due him from the estates of their mother and brother. The paper had been wadded up and was covered in blood.

The victim's divorce attorney, Richard Skip Carnell, was also called to testify. He stated that he had several conversations with the defendant regarding the victim, one of which occurred on the day before the murder. The defendant was interested in the victim's divorce proceedings, which were nearly complete. Carnell testified that the defendant was "very pushy" and demanded to know what property was involved in the divorce, specifically asking him about a $11,000 antique tea set. The defendant also asked about the trust account and credit card charges on Mrs. Howard's card, which the victim believed the defendant had made. Carnell told the defendant that none of these items were brought up in the divorce proceedings. When the defendant asked about the money missing from the trust accounts, Carnell stated that he told him, "[I]f it wasn't for the good graces of [the victim], [you] would be in jail right now because [I] told [the victim] to turn it over to the police, and it was a substantial amount. It was $109,000." The defendant replied that he did not want Mr. Carnell involved and that he would deal with his brother himself.

Mr. Carnell testified that he was aware the victim had an alcohol problem but stated that he had never known him to be violent to anyone. He was aware of the order of protection issued to Mrs. Howard but stated that they were "pretty standard" in divorce cases. Mr. Carnell last spoke with the victim on the day of the murder and believed that he was in the best mood he had been in for some time.

Mr. William Lenahan, a fraud investigator, testified that he had known the victim for thirty years. In January 2003, the victim contacted him and questioned him regarding the situation with the money from the estates of his mother and brother. He met with the victim in April and advised him to retain a lawyer and initiate a civil lawsuit over the matter.

Robert Brown testified that he, the defendant, and the victim lived in the same neighborhood. At approximately 6:30 p.m. on the night of the murder, Brown and his wife were sitting on the front porch of their home when they heard a man scream, "Help me. Help me." He ran across the street to where the voice came from and called out to the man. Brown again heard the man ask for help. He could not get into the yard of the house where the men were because a chain link fence was between the houses. Brown looked over the fence and again heard the man say, "Help me. He has [a] knife. He's stabbing me." According to Brown, he saw two men in the back of the house and one man was standing over the other. He stated that the second man was "slumped down kind of on his knees on the stoop." Brown saw the man, who was standing, bend over the victim, hold the victim around the chest in front of him, and make a downward chopping motion. Brown testified that it was dusk but that he was able to see because the porch light of the house was on. At this point, he returned to his home to call 9-1-1. When he returned to the scene, he saw the victim lying

on the ground with a "shiny substance" on the ground around him. At this point, he observed the defendant go back into the house.

Officer Ricky Davison of the Crime Scene Investigation Unit testified that he found blood spatters throughout the entire house. He collected samples and placed them in the property room. A forensic serologist with the Tennessee Bureau of Investigation (TBI) testified that she tested various samples from the crime scene and that the victim's blood was found on a switchblade knife, on eyeglasses found at the scene, in the den, in the study, on a letter which had been ripped, and on a knife with a wooden handle.

Dr. O.C. Smith performed the autopsy on the victim and testified that he suffered sharp force damage to his left carotid artery. He identified four stab wounds to the victim's neck and stated that the victim had multiple wounds to his scalp, as well as circular bruises which could have been caused by the butt end of a folding knife. The victim also had multiple abrasions on the left side of his face. There was also an abrasion to his forehead, some bruises on the tip of his nose, and smaller abrasions on his cheek and chin. On the right side of his face, the victim's cheek bone had abrasions indicating impact with a flat surface such as a floor or the ground. The victim's hands and forearms also had bruises and scrapes. Dr. Smith testified that he determined that, based upon the blood patterns found throughout the house, the victim's carotid artery was not severed inside the home. He concluded that this lethal injury occurred outside of the house.

The defendant testified in his own behalf at trial and stated that he acted in self-defense. He stated that when he arrived home from work, the victim was "agitated" and wanted him to sign an agreement regarding the trust fund whereby the defendant would repay the money by obtaining a mortgage. The defendant stated that he refused to sign the document, and the victim "flew into a fit of rage[.]" The defendant testified that the victim jumped on him and began to beat him and that the two fought throughout the home. Initially, the defendant testified that he let the victim beat on him but stated that he grew tired of it and told the victim to "get off of me and leave me alone[.]" He testified that he then hit the victim with the butt end of a closed folding knife in order to knock the victim unconscious, but it only made the victim angrier. The fight progressed to the back bedroom of the home where the defendant again tried to knock the victim unconscious. According to the defendant, he then tried to get out of the house, but the victim was right behind him. The defendant testified that he told the victim, "You either quit or I'm going to cut you." The victim persisted, so the defendant stated that he cut him in the neck.

The defendant's statement given to police was also admitted. In the statement, the defendant admitted stabbing the victim. According to the defendant, the victim had anger management problems, had threatened his wife, and had accused the victim of stealing from him and having an affair with the victim's wife. In the statement, he told police that shortly after he arrived home, the victim confronted him about selling their home. He stated that the victim had told him that he knew several ways to kill people. The defendant stated that he was terrified. The altercation began in the kitchen and progressed throughout the house. He said that he tried to stop the victim but that hitting him only made him angrier. The fight eventually progressed to the carport where he opened his knife

to threaten the victim. He then acknowledged wounding the victim in the throat multiple times to make him stop. Afterwards, he called 9-1-1. The defendant also described his own injuries, which included a one-inch wound on his left thumb, a swollen and discolored right hand, and a bruised knee.

A second statement was given shortly after the first in which the defendant described hitting the victim in the head with a closed four-inch folding knife approximately fifteen to twenty times. The defendant also stated that he had moved a gun into the kitchen after the altercation, stating he did not know if the victim was going to return to the fight.

The defense also called Dr. William Walters, a psychiatrist. He testified that he did not treat the victim but had reviewed documents in the case. Based upon his review of these documents, he believed that the victim was delusional and violent.

After hearing the evidence presented, the jury convicted the defendant of first degree murder as charged. Following the denial of his motion for new trial, the defendant filed the instant timely appeal.

**Analysis**

## I. Sufficiency of the Evidence

In two separate issues, the defendant asserts that the evidence produced at trial was insufficient to support the verdict. Specifically, he contends that the evidence was not sufficient to establish that the killing was not done in self-defense and that the element of premeditation was not established. In considering this issue, we apply the rule that where the sufficiency of the evidence is challenged, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the [State], *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *see also* Tenn. R. App. P. 13(e). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). This court will not reweigh or reevaluate the evidence presented. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

"A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt so that, on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). These rules are applicable to findings of guilt predicated upon direct

evidence, circumstantial evidence, or a combination of both. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Although a conviction may be based entirely upon circumstantial evidence, *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1974), in such cases, the facts must be "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the [d]efendant and the [d]efendant alone." *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991) (citing *State v. Duncan*, 698 S.W.2d 63 (Tenn. 1985)). However, as in the case of direct evidence, the weight to be given circumstantial evidence and "the inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *Marable v. State*, 203 Tenn. 440, 452, 313 S.W.2d 451, 457 (Tenn. 1958) (citations omitted).

### a. Self-Defense

When the defense of self-defense is asserted, it is the State's burden to negate the existence of self-defense beyond a reasonable doubt. T.C.A. § 39-11-201(a)(3) (2006). It is the jury's responsibility to determine whether the State negated the defense. *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). We agree with the defendant that self-defense was raised by the proof in this case based upon the defendant's testimony. However, we are unable to agree with his assertion that the State failed to negate the evidence of the defense.

In support of his argument, the defendant relies upon the testimony of Dr. Smith who testified that the defendant's statements were consistent with the physical evidence. He also questions the reliability of Robert Brown's testimony based upon the fact that Brown acknowledged that it was dusk, implying that he could not see clearly so his testimony should have been discounted. The defendant further contends that "it was made abundantly clear during the trial that [the victim] was a violent man." Finally, he contends that the State failed to test certain swabs of blood which could have buttressed his own theory of the case.

In his argument, the defendant relies upon facts which were placed before the jury. His argument is essentially nothing more than a challenge to the weight and credibility of evidence admitted. All this evidence was put before the jury at trial through the presentation of witnesses and thorough cross-examination by the defense. It is the jury's responsibility to determine the credibility of the witnesses and the weight to be given their testimony. This court will not reweigh the evidence or substitute its inferences for those of the trier of fact. The jury in this case heard the testimony of all witnesses and viewed numerous exhibits. The defendant himself testified that the altercation was started by the victim. He testified that he was injured during the altercation and that evidence of his injuries was shown to the jury. In this case, based upon the verdict, the jury accredited the testimony of the State's witnesses and rejected the defendant's claim. He is entitled to no relief on this issue.

### b. Premeditation

The defendant was convicted of first degree murder which is defined, in relevant part, as "[a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2006). Premeditation necessitates "a previously formed design or intent to kill," *State v. West*, 844 S.W.2d 144, 147 (Tenn. 1992) (citations omitted), and "an act done after the exercise of reflection and judgment . . . [, meaning] that the intent to kill must have been formed prior to the act itself." T.C.A. § 39-13-202(d). An additional requirement is that the accused be "sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

The element of premeditation is a question of fact to be determined by the jury from all the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Bordis*, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995). Our supreme court has delineated several circumstances which may be indicative of premeditation, including declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence, and calmness immediately after the killing. *State v. Jackson,* 173 S.W.3d 401, 409 (Tenn. 2005); *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000).

In support of his argument that the element of premeditation was not established by the proof presented, the defendant asserts that none of the circumstances indicative of premeditation were established by the proof presented. Moreover, he contends that the fact that the jury deliberated for only one hour establishes that they did not properly consider all the evidence and that the trial court, acting as the thirteenth juror, erred by not overturning the verdict. We disagree.

After review of the record, we conclude that the State presented evidence which would have allowed a rational trier of fact to infer premeditation. Specifically, the State presented multiple witnesses who established that the defendant's motive for murder was the improper financial dealings between the victim and the defendant. Testimony was presented by both Mrs. Howard and Mr. Carnell that the defendant was in an agitated or pushy state regarding the victim during the days immediately prior to the murder. Moreover, Mr. Lenahan testified that he had advised the victim to institute a lawsuit against the defendant just days prior to his death. Additionally, the manner of the killing in this case allows for an inference of premeditation. Mr. Brown testified that he heard a man repeatedly shouting for help and that he was being stabbed. He observed the victim on his knees and the defendant making a downward chopping motion as he stood over the victim. There is nothing in the record to indicate that the victim was armed with a weapon, and only the defendant testified that the victim had any form of martial arts training. Additionally, the number of wounds inflicted upon the victim, especially in comparison with the injuries received by the defendant, supports a finding of premeditation.

Moreover, we further reject the defendant's argument with regard to the length of time the jury deliberated. Case law has established that an argument based on the length of time a jury

deliberates, without more, is not a cognizable issue on appeal. *State v. Thacker*, 164 S.W.3d 208, 238 (Tenn. 2005). Additionally, we find nothing improper in this case with regard to the trial court's role as the thirteenth juror. Tennessee Rule of Criminal Procedure 33(d) allows the trial court to grant a new trial if it disagrees with the weight of the evidence. However, the rule does not specifically require the court to make a specific statement on the record approving the verdict. When a court overrules the motion for new trial, we may presume that the trial court has served as the thirteenth juror. *State v. Moats*, 906 S.W.2d 431, 434 (Tenn. 1995). Here, the court stated in its order denying the defendant's motion for new trial that it adopted the jury's verdict. Thus, we find no error.

## II. Sequestration of the Jury

Next, the defendant asserts that the trial court erred in refusing his request to sequester the jury, which he contends caused him actual prejudice. According to the defendant, both the State and defense counsel asked for a sequestered jury prior to trial, but the request was denied. He goes on to add that, after the proof was concluded, "the jury took a short break, went to lunch, and in less than an hour returned a verdict of guilty on premeditated first degree murder." He argues that the brief period of time taken to reach the verdict illustrates that it was "highly doubtful that the jury was adequately impressed by the judge's instructions as to the seriousness of their duty and the strict prohibition not to talk or seek information about the case, even amongst themselves, until they began deliberations." He further contends that there is a legitimate question as to whether the jury was free of outside influences based upon comments made by the trial court. The comments in questions were:

> THE COURT: . . . I neglected to tell you one thing yesterday. I - - maybe more than that but one that was brought to my attention this morning. During the trial since we have let you - - not locked up or sequestered, you can't talk with the lawyers or the witnesses or anybody else. I mean you can certainly speak to them and say good morning or something like that, but we're in a situation here where we're involved in the business of getting the case tried, and we don't need to get into socializing at this point.

Tennessee Code Annotated section 40-18-116 (2006) provides that "[i]n all criminal prosecutions, except those in which a death sentence may be rendered, jurors shall only be sequestered at the sound discretion of the trial judge, which shall prohibit the jurors from separating at times when they are not engaged upon actual trial or deliberation of the case." On appeal, this court "will not find error in a trial court's refusal to grant a sequestered jury absent an abuse of discretion." *State v. Larry Walcott*, No. E2004-02705-CCA-R3-CD (Tenn. Crim. App., at Knoxville, Aug. 22, 2005). The Sixth Circuit Court of Appeals has held that "the failure to sequester a jury standing alone could rarely, if ever, constitute reversible error. A defendant would have to demonstrate actual prejudice or at least substantial likelihood thereof flowing from the failure to sequester in order to warrant a new trial." *United States v. Johnson*, 584 F.2d 148, 155 (6th Cir. 1978).

To support his argument, the defendant relies upon *State v. Furlough*, 797 S.W.2d 631 (Tenn. Crim. App. 1990), which held that a defendant in a murder trial had a right to a sequestered jury. However, his reliance is misplaced. While he correctly cites to the law applied in that case, his argument ignored that effective May 8, 2002, Tennessee Code Annotated section 40-18-116 was amended to the reflect the current law, as cited to above. Thus, it has statutorily been made clear by our legislature that the decision to sequester a jury in all criminal prosecutions, except death penalty cases, is subject to the sound discretion of the trial court. Because the defendant's case was tried in 2007, the controlling law is the statutory provision.

Initially, the State contends that the defendant has waived review of the issue based upon his failure to prepare an adequate record for review. We agree. Despite the defendant's assertion that both defense counsel and the State requested sequestration, he has failed to include in the record the motion for sequestration, a transcript of the discussion, or the trial court's basis of denial for said motion. The defendant has failed to include a transcript of the hearing for the motion for new trial on appeal and, thus, we are unable to review the trial court's reasons for the denial of the motion for new trial. The order contained in the records is a blanket order simply stating that the motion is overruled without enumerating any reasons. Thus, we are foreclosed from review and must presume that no abuse of discretion occurred in the trial court's decision. *See* Tenn. R. App. P. 24 (providing that it is the appellant's duty to prepare a fair, accurate, and complete record on appeal to enable this court to conduct a meaningful review); *see also State v. Charles Curtis*, No. W2006-02347-CCA-R3-CD (Tenn. Crim. App. at Jackson, Dec. 26, 2007) (finding waiver of sequestration issue based upon defendant's failure to provide adequate record for review).

Moreover, the defendant has failed to show how the failure to sequester the jury prejudiced his case. The fact that the jury deliberated only a short period of time is not sufficient to establish that the jury was not "adequately impressed" with the instructions given regarding their duty or the prohibition against speaking with outside influences. Moreover, the comments made by the trial court are also insufficient to establish prejudice. Review of the record indicates that the comments were made at defense counsel's request on the second day of trial. However, nothing establishes that any outside influence on the jury occurred. Thus, the defendant is not entitled to relief. *See* Tenn. R. App. P. 36(b).

## III. Admission of Photographs

The defendant argues that the trial court erred in denying his motion to suppress "all graphic photographs of the deceased, the probative value of which was substantially outweighed by their unfair prejudicial impact and effect on the jury." Specifically, he challenges the admission of three photographs of the victim, two of which were "particularly prejudicial" as they depicted the victim's body lying in the driveway. He contends that "[n]either of these photographs accurately depicts the way the scene looked that night as the photographers used high powered flash bulbs to illuminate the scene." He asserts that "they do not accurately represent what any of the witnesses could have seen that night, and were presented unnecessarily as the defendant challenged neither the injuries nor the location where the victim was found."

Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978) (citations omitted). Accordingly, "the admissibility of photographs lies with the discretion of the trial court" whose ruling "will not be overturned on appeal except upon a clear showing of an abuse of discretion." *State v. Faulkner*, 154 S.W.3d 48, 67 (Tenn. 2005) (*quoting Banks*, 564 S.W.2d at 949). However, before a photograph may be entered into evidence, it must be relevant to an issue that the jury must decide, and the probative value of the photograph must outweigh any prejudicial effect that it may have upon the trier of fact. *State v. Vann*, 976 S.W.2d 93, 102 (Tenn. 1998), *cert. denied*, 526 U.S. 1071, 119 S. Ct. 1467 (1999); *State v. Braden*, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993), *perm. to appeal denied* (Tenn. 1993) (citation omitted); *see also* Tenn. R. Evid. 401, 403. Rule 401 of the Tennessee Rules of Evidence defines relevant evidence as being "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Photographs of a corpse are generally admissible in a murder prosecution if they are relevant to the issues presented at trial, notwithstanding their gruesome character. *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003). Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issues at trial and their prejudicial effect is outweighed by their probative value. *Banks*, 546 S.W.2d at 949-51. However, evidence that is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. While it can be said that photographs of crime victims who suffer serious bodily injury are prejudicial by their very nature, a prejudicial photograph is not *per se* excludable. What is excluded is evidence which is unfairly prejudicial, in other words, evidence which has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. *Id*. at 951.

As argued by the State on appeal, the defendant has also waived review of this issue by his failure to present a complete record on appeal. Rule 24 of the Tennessee Rules of Appellate Procedure provides that it is an appellant's duty to prepare a fair, accurate, and complete record on appeal in order to enable this court to conduct a meaningful review. In this case, the defendant challenges the denial of his motion to suppress photographs but has failed to include in the record either a transcript of a hearing on the motion or an order giving the trial court's reason for its denial of the motion. When an appellate record does not contain a complete record, this court must presume that a trial court's ruling was supported by sufficient evidence. *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

Though it is not clear in this case why the photographs were admitted by the trial court because of the lack of a complete record, we note that it has been repeatedly held that a trial court properly admitted photographs in cases in order to establish the nature of the victim's injuries, to show that a defendant acted with premeditation, and to contradict a defendant's theory of self-defense. *State v. Cole*, 155 S.W.3d 885, 912-13 (Tenn. 2005); *State v. Smith*, 868 S.W.2d 561, 576 (Tenn. 1993); *State v. Goss*, 995 S.W.2d 617, 627 (Tenn. Crim. App. 1998). These appear to be appropriate bases for admission in the instant case, as the State was required to show that the

defendant acted with premeditation and to refute the defendant's claim of self-defense. The extent of the victim's injuries shown in these photographs is relevant to both issues, and the State was entitled to introduce the photographs in support of its case. We find nothing in the record to establish that the photographs were unduly prejudicial in their depiction of the scene. We further reject the defendant's contention that they do not accurately represent the scene because of the use of a high-powered flash. Each witness identified the photographs as representative of what they saw on the evening in question. Thus, the issue is without merit.

## IV. *Brady v. Maryland*/**Tennessee Rule of Criminal Procedure 16 Violation**

Next, the defendant contends that the trial court erred in admitting the tests results from two blood samples when those results were not received by the defendant until the second day of trial, which thereby deprived "the defense of the opportunity to independently examine and evaluate the evidentiary relevance and value of said samples" and denied him "the ability to properly plan a trial strategy in advance of trial." According to the defendant, this violated both the principles of *Brady v. Maryland* and Tennessee Rule of Criminal Procedure 16. The two samples in questions were taken from a butcher knife found in the kitchen and a torn memo found in the sink.

At trial, the TBI forensic serologist testified that she performed tests on nineteen blood samples. Defense counsel objected to the admission of the last two samples because the results of the tests had not been provided to him in discovery. After it was determined that the results had, in fact, not been provided, the trial court instructed the State to give them to defense counsel at that point. At a jury-out hearing, the assistant district attorney stated that the failure was an oversight. Defense counsel acknowledged that he had seen the actual knife and the letter as part of the discovery. After viewing the results of the tests, defense counsel stated they were ready to proceed. The serologist then testified that the blood found on the knife came from the victim and that blood on the memo was the defendant's.

Prior to trial, the State has a duty to turn over to the defendant all materials which are favorable to a defendant. In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S. Ct, 1194, 1196-97 (1963). In order to establish a due process violation under *Brady*, four prerequisites must be met:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). The defendant has the burden of proving a constitutional violation by a preponderance of the evidence. *State v. Spurlock*, 874 S.W.2d 602, 610 (Tenn. Crim. App. 1993). Demonstrating a constitutional violation requires the defendant to show that, without the omitted material, he has been denied the right to a fair trial. *United States v. Agurs*, 427 U.S. 97, 108, 96 S. Ct. 2392, 2399 (1976).

In this case, the defendant has failed to establish a violation of *Brady* because he has not shown that the evidence was favorable to his defense. Favorable evidence includes evidence that "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Johnson v. State*, 38 S.W.2d 52, 56-57 (Tenn. 2001). The defendant denied that this knife was used in the altercation. Thus, the presence of the victim's blood on that knife in no way has aided his case. Moreover, we are unable to conclude that the presence of the defendant's blood on the memo was favorable to the case.

The defendant is also not entitled to relief pursuant to Tennessee Rule of Criminal Procedure 16. That rule provides, in relevant part, that the State is to disclose:

> (G)    Reports of Examinations and Tests: Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph the results or reports of physical or mental examinations, and of scientific tests or experiments if:
>
> > (i)     the item is within the state's possession, custody, or control;
> >
> > (ii)    the district attorney general knows - - or through due diligence could know - - that the item exists; and
> >
> > (iii)   the item is material to preparing the defense or the state intends to use the item in its case-in-chief at trial.

Tenn. R. Crim. P. 16(a)(1)(G). If a party fails to comply with a discovery request, "the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances." Tenn. R. Crim. P. 16(d)(2)(A)-(D). Whether a defendant has been prejudiced by the State's failure to disclose information is a significant factor in determining an appropriate remedy. *State v Smith*, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). When arguing that the State violated Rule 16, the defendant bears the burden of showing "the degree to which the impediments to discovery hindered trial preparation and defense at trial." *State v. Brown*, 836 S.W.2d 530, 548 (Tenn. 1992).

-12-

We agree with the defendant's assertion that a violation of the rule did occur. However, review of the record indicates no error in the remedy fashioned by the trial court. The court saw to it that the defense was furnished with the evidence in question. Regardless, the defendant's blanket assertion that his trial preparation and defense were hampered by the fact that he did not receive this evidence is not sufficient to satisfy his burden. He has failed to show any actual impediments caused by the lack of the evidence. Defense counsel indicated that, even though he was unaware of the results of the blood tests, he was aware of both the knife and the memo. The knife was found in the kitchen where the fighting started. The defendant, himself, gave testimony that his blood would be on the memo. There is simply no showing that the failure to provide these two tests impeded the defendant's preparation and defense at trial.

## V. Chain of Custody of Blood Samples

The defendant contends that the trial court erred in determining that the State had established a valid chain of custody for certain blood samples tested by the TBI. According to the defendant, the record makes clear that the State failed to establish how or by whom the blood swabs were removed from the property room and received via mail by Debnam at the TBI in another city.

Before tangible evidence can be admitted into evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody. *State v. Kilpatrick*, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000). While every possibility of tampering does not have to be excluded, the circumstances must establish a reasonable assurance of the identity and integrity of the evidence. *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000). The chain of custody requirement is "'to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *Id*. (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). However, the State is not required to exclude every possibility of tampering. *Id*. Rather, "[t]he evidence may be admitted when the circumstances surrounding the evidence reasonably establish the identity of the evidence and its integrity." *Id*. Thus, the failure to call each and every witness who handled the evidence does not necessarily preclude its admission. *State v. Johnson*, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984). It is in the sound discretion of the trial court to determine whether the chain of custody requirement has been satisfied, and the trial court's determination will not be overturned in the absence of a clearly mistaken exercise of that discretion. *Kilpatrick*, 52 S.W.3d at 87; *State v. Holbrooks*, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998).

Officer Davison testified that he collected the swabs from various areas at the crime scene and, after identifying them, delivered them to the property room. Ms. Debnam testified that she received the three groupings of various samples on April 14, 2003; January 11, 2006; and April 28, 2006. She further testified that, following testing, she returned the samples to the Memphis Police Department on November 3, 2003, and on July 12, 2006. Defense counsel raised an objection with regard to chain of custody in that the State had failed to establish how the evidence got from the property room to Ms. Debnam. In response, the trial court stated:

Well, they can bring Sergeant Kern in who sends all those things up there. I know that from past cases. They just - - that's the way - - who it goes through. If you want it to happen, I guess you can bring them in. I'm going to make a ruling at this point that you can ask about chain of custody with this - - with this defendant, but I'm going to allow - - I mean with this witness rather, but I'm going [to] allow this to come in.

After review, we conclude that the trial court did not abuse its discretion in allowing the swabs into evidence. Although the testimony of one "link" in the chain was not available, we conclude that the testimony presented was sufficient to establish "the identity of the evidence and its integrity." The swabs were collected and labeled at the crime scene and taken to the property room, where standard procedure was that they were mailed to the lab. Ms. Debnam testified that she received the items "from another officer" and then returned them to the Memphis Police Department. This is sufficient to rebut the possibility of tampering, substitution, and loss. Moreover, the trial court specifically told defense counsel that he was free to question the witness regarding chain of custody, but no questions were asked in that regard. Further, as noted by the State, even if error had occurred, it would have been harmless pursuant to Tennessee Rule of Criminal Procedure 52(a), as the swabs taken, which contained blood from both the defendant and the victim, were obviously from this crime scene.

## VI. Opinion Testimony of Attorney Witness

Next, the defendant contends that the trial court erred in allowing Richard Carnell to testify, over defense objection, "as to his opinions and conclusion." He asserts that this testimony was highly prejudicial to the defendant, as the witness presented confusing, unfounded, and speculative testimony to the jury. Specifically, he appears to challenge the following testimony, elicited by the State on direct examination, as "unfounded and speculative."

[Mr. Carnell]:       I last spoke to [the defendant] regarding [the victim] the Thursday, the day before . . . [the victim] died.

[The State]:         And what do you recall about that conversation?

[Mr. Carnell]:       . . . But my last conversation with [the defendant] was that very day. I went back to the office received a phone call from [the defendant], and he was very interested in what was going on was real pushy and wanting to the point of almost - -

[Defense Counsel]:  Your Honor, we're going to object on conclusion, opinion.

[The Court]:         Well, I believe his testimony - - no, I think those are proper. I think he can say what the testimony - - what the conversation was about. I'll overrule the objection.

-14-

[Mr. Carnell]: He was very pushy, demanding, wanting to know what was involved. He specifically started asking about an $11,000 tea set, antique engraved tea set, indicating that he was told that that matter had been discussed between Ms. Howard and myself and [the victim]. I told him that that was a lie because that matter never came up except . . . [the victim] had asked me if - -

[Defense Counsel]: I'm objecting, Your Honor.

[The Court]: All right. We'll not go in into any conversations with the deceased at this time.

[Mr. Carnell]: He also asked me about the issue of charging up credit cards on Ms. Howard's account, and his brother's, his deceased - - Charles - - his deceased brother Charles account, once again told him that didn't come up. He started asking about the monies that were allegedly taken out of [ ] his mother's account and his brother's joint account that [the defendant] and him had a joint access to and joint signatures on the account.

And I told him that, you know, if it wasn't for the good graces of his brother, as far as I was concerned, he would be in jail right now because I told him to turn it over to the police, and it was a substantial amount. It was $109,000. He said he didn't want me to be involved with it, and that he was going to take care of it himself, and he was going to deal with it with his brother himself.

[The State]: And that was the last conversation you had with [the defendant] before [the victim's] death?

[Mr. Carnell]: Yes. That's correct.

[The State]: The day before [the victim's] death?

[Mr. Carnell]: That is correct.

[The State]: Okay. Now, . . . were you aware that [the victim] had a problem with alcohol?

[Mr. Carnell]: Yes, I was. It wasn't any big secret you know. . . .

| | |
|---|---|
| [The State]: | Did he ever become violent or anything when he was drunk? |
| [Mr. Carnell]: | I've never known [the victim] to be violent to anybody.<br>. . . . |
| [The State]: | Now when was the last time you spoke to [the victim] before his death? |
| [Mr. Carnell]: | I actually the next day as a matter of fact. [The victim] had been trying to call me, which was a Friday. It was the 4th, the day he died. [The victim] called me. He had been trying to call me all day, and unfortunately I had been tied up, and he was finally able to get through to me about a quarter to five that day, and we spoke at length about matters involving his brother, and he read me what he was proposing - - |
| [Defense Counsel]: | Objection, Your Honor, I mean I don't know - - |
| [The Court]: | You can't discuss - - |
| [The State]: | I'll re-ask the question. |
| [The Court]: | All right. |
| [The State]: | Could you describe [the victim's] mood that day? |
| [Defense Counsel]: | That draws for a conclusion, Your Honor. |
| [The State]: | I think it calls for an observation, Your Honor. |
| [Defense Counsel]: | He said he talked on the phone. I don't know how he could have observed him? |
| [The Court]: | All right. The Court will allow you, if you can talk about your conversation with him, if you drew some - - whatever you drew from that you'll - - as far as his demeanor, I'll allow that. |
| [Mr. Carnell]: | From the Thursday forward to the Friday, [the victim] was in the best mood I'd seen him in a long time, well, ever since the divorce got started. He seemed to be putting it behind him |

and his demeanor was - - he was the happiest that I'd seen him in a long time.

Based upon this testimony, the defendant asserts that Mr. Carnell "made it clear that he was willing to misrepresent the facts in order to help the prosecution convict the Defendant when he testified falsely under the State's direct examination that he was unaware of the deceased's violent nature, when in fact, Attorney Carnell represented the deceased at the Order of Protection hearing during which his client was accused of threatening his wife." He points to the fact that upon cross-examination, Mr. Carnell acknowledged that the Order of Protection was requested due to the deceased's prior acts of violence and for the safety of Marcia Howard and that he was aware of the threats received by Howard. As such, the defendant asserts that "[u]pon observing Mr. Carnell's demeanor when confronted with the truth during cross-examination, it should be evidence to all that Mr. Carnell's truthfulness was suspect and the weight of his testimony was tarnished."

The defendant's argument in actuality appears to be a challenge to the credibility of the witness, particularly in light of his assertion that the witness "was willing to misrepresent the facts." As argued by the State, this court is not the proper arena for a credibility challenge. It is the jury who is charged with making credibility determinations, not this court. *State v. Smith*, 24 S.W.3d 274, 278 (Tenn. 2000). It is not the function of this court to reweigh the credibility of witnesses on appeal. *Id*. at 278-79. The testimony was heard by the jury in this case, and defense counsel did an excellent job on cross-examination of putting any discrepancies before the jury. The jury, based upon the verdict, accredited the testimony of Mr. Carnell, a decision which we will not disturb.

In fact, in his reply brief, the defendant acknowledges that the credibility of a witness is for the jury to determine but asserts that here "the testimony ought not to have been allowed at all. It was irrelevant and highly prejudicial." Thus, we review the admission of the testimony upon those grounds.

"The admissibility of evidence is generally within the broad discretion of the trial court . . . [and that,] absent an abuse of that discretion, the trial court's decision will not be reversed." *State v. Edison*, 9 S.W.3d 75, 77 (Tenn. 1999) (citing *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn.1996). Admissible proof must satisfy the threshold determination of relevancy mandated by Tennessee Rule of Evidence 401, which defines relevant evidence as that "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 403 adds that relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

Contrary to the defendant's assertion, the testimony objected to at trial was clearly relevant evidence, as it related to conversations with both the defendant and the victim. The context of much of the questioning involved the testimony about the witness's relationship with the victim while acting as his divorce attorney. Moreover, at trial, the defendant failed to object to the evidence upon

relevancy grounds. As to the "opinions and conclusions" offered by Mr. Carnell, we also reject the contention that they were "confusing, unfounded and speculative." As noted in the recitation of the testimony, Mr. Carnell testified to facts arising from two conversations, one with the victim and one with the defendant. He further stated that he had personally never known the victim to be violent. The testimony given was clear and precise.

## VII. Cross-examination of Witnesses

Next, the defendant contends that the trial court erred by refusing to allow defense counsel to publish the order of protection and a copy of a death threat made by the victim immediately after they were introduced as exhibits. From a reading of the record, it appears that each exhibit was entered during the testimony but was not published to the jury until after each witness had finished testifying. The defendant argues that this refusal limited his right to cross-examine the two witnesses, Marcia Howard and Richard Carnell, because the jury did not have the actual exhibits "at a time calculated to focus [their] attention on the witness's dishonesty." He stated that "[b]y casually refusing to allow defense counsel to pass these exhibits to the[j]ury at the appropriate time, the Court sent a message to the jury, who look to the trial court judge for leadership, that said evidence of the witnesses' dishonesty was not important when in fact it was crucial to the defense's case."

It is well-settled that the Confrontation Clause of the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide two protections for criminal defendants: the right to physically face witnesses and the right to cross-examine witnesses. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S. Ct. 989, 998 (1987); *see also State v. Middlebrooks*, 840 S.W.2d 317, 332 (Tenn. 1992). These constitutional rights include the right to conduct meaningful cross-examination of witnesses. *State v. Brown*, 29 S.W.3d 427, 431 (Tenn. 2000); *Middlebrooks*, 840 S.W.2d at 332. Denial of the right to effective cross-examination of witnesses amounts to "'constitutional error of the first magnitude' "and may violate the defendant's right to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting *Davis v. Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 1111 (1974)). However, we observe that "[t]rial judges are empowered with great discretion regarding the trial process, including the scope of cross-examination," and that such "discretion will not be disturbed unless an abuse" thereof is found. *State v. Williams*, 929 S.W.2d 385, 389 (Tenn. Crim. App. 1996). Additionally, the trial court can, and often does, impose limits on cross-examination. *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994).

Moreover, the right to examine a witness for bias is a fundamental right. *State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001). It is a fundamental principle of law that an accused has the right to cross-examine a prosecution witness to impeach the credibility or establish the motive or prejudice of the witness. This includes the right to cross-examine a prosecution witness regarding any promises of leniency, promises to help the witness, or any other favorable treatment offered to the witness. *State v. Spurlock*, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993).

The defendant asserts that the testimony given by Marcia Howard and Richard Carnell was contradicted on material points by the two separate exhibits and that the jury, if they had the documents, at the time of testimony would have been more apt to recognize the variations. Specifically, he refers to Carnell's "attempt[] to mislead the jury by characterizing an order of protection as mutual" and both witnesses' testimony that the victim never exhibited violence during his life, which the defendant claims was refuted by statements made in the order of protection.

Review of the record fails to reveal how this implicates the defendant's right to thoroughly cross-examine witnesses. From a reading of the transcript, it is apparent that the defense attorney thoroughly cross-examined both of these witnesses about the order of protection and the victim's violent tendencies. In fact, portions of the order were even read aloud by Mr. Carnell. The trial court did not limit that cross-examination in any way. We cannot conclude that the court's procedure of publishing exhibits immediately following a witness's testimony affected the defendant's right to cross-examination in any way, particularly in regard to the witness's credibility. Thus, the defendant is entitled to no relief on this issue.

## VIII. Cumulative Error

Finally, the defendant contends that the case should be reversed and remanded based upon cumulative error. He argues that even if the court finds that each of his other challenged issues does not rise to the level of prejudicial error, the cumulative effect of all the errors resulted in prejudicial error to the defendant. However, in light of our previous determination that the defendant's individually assigned issues are without merit, his argument of cumulative error is likewise without merit, and he is entitled to no relief.

### CONCLUSION

Based upon the foregoing, the judgment of conviction is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE

-19-